**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NILS HENNINGER and DAWN CORSON BORCY, in their individual capacities, and on behalf of the UMass Memorial Health Care 401(k) Plan and the UMass Memorial Health Care 403(b) Plan, and on behalf of all similarly situated participants and beneficiaries of the plan(s),<br><br>               Plaintiffs,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.; JOHN and JANE DOES 1-30 IN THEIR CAPACITIES AS FIDUCIARIES,<br><br>               Defendants. | Civil Action No. 4:26-cv-40109 |

**DEFENDANT'S MEMORANDUM OF**
**LAW IN SUPPORT OF ITS MOTION TO DISMISS**

TABLE OF CONTENTS

INTRODUCTION ...............................................................................................................................1

FACTUAL BACKGROUND ...........................................................................................................3

LEGAL STANDARDS .....................................................................................................................8

ARGUMENT.....................................................................................................................................9

    I.      Plaintiffs Lack Article III Standing....................................................................................10

        A. Plaintiff Borcy Lacks Standing Because She Did Not Participate in Either Plan. ............11

        B. Plaintiff Henninger Lacks Standing Because The Challenged Freedom Funds Share
           Classes Made Him Better Off. ......................................................................................12

        C. Plaintiff Henninger Lacks Standing to Pursue Claims Related to The MFS Value Fund
           And The Baron Small Cap Fund.....................................................................................14

    II.     The Complaint Fails to State a Plausible Claim for Relief................................................15

        A. Plaintiffs' Allegations Fail to Raise an Inference of Imprudence.....................................15

        B. Plaintiffs Fail to Allege Disloyal Conduct.......................................................................17

        C. The Court Should Dismiss Plaintiffs' Co-Fiduciary Claim...............................................18

CONCLUSION................................................................................................................................19

TABLE OF AUTHORITIES

Cases

*Albert v. Oshkosh Corp.*,
   47 F.4th 570 (7th Cir. 2022) ................................................................................................. 4, 17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ....................................................................................................................... 9

*Beddall v. State Street Bank and Tr. Co.*,
   137 F.3d 12 (1st Cir. 1998) .......................................................................................................... 11

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 554 (2007) ....................................................................................................... 3, 9, 15, 19

*Cunningham v. Cornell Univ.*,
   604 U.S. 693 (2025) .................................................................................................................. 1, 8

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*,
   958 F.3d 38 (1st Cir. 2020) .......................................................................................................... 11

*Dubuisson v. United* States,
   No. 21-12116-JGD, 2021 WL 753346 (D. Mass. Feb. 22, 2021) ............................................ 10

*Eggert v. The Merrimac Paper Co., Inc. Leveraged Employee Stock Ownership Plan and Trust*,
   311 F. Supp. 2d 245 (D. Mass. 2004) ...................................................................................... 10

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014) .................................................................................................................. 1, 9

*Fishman Haygood Phelps Walmsley Willis & Swanson, L.L.P. v. State St. Corp.*,
   No. 1:09-10533-PBS, 2010 WL 1223777 (D. Mass. Mar. 25, 2010) ...................................... 14

*Frith v. Whole Foods Market, Inc.*,
   38 F.4th 263 (1st Cir. 2022) ................................................................................................. 16, 17

*Gideon Asen LLC v. Glessner*,
   583 F. Supp. 3d 242 (D. Me. 2022) .......................................................................................... 8

*Hughes v. Nw. Univ.*,
   63 F.4th 615 (7th Cir. 2023) ................................................................................................. 4, 18

*Hughes v. Nw. Univ.*,
   595 U.S. 170 (2022) ........................................................................................................... passim

ii

*In re Biogen, Inc. ERISA Litig.*,
  No. 20-cv-11325-DJC, 2021 WL 3116331 (D. Mass. July 22, 2021) ..................................... 18

*In re Boston Scientific Corp. ERISA Litig.*,
  254 F.R.D. 24 (D. Mass. 2008) .............................................................................................. 14

*Jackson v. New England Biolabs, Inc.*,
  729 F. Supp. 3d 60 (D. Mass. 2024) ...................................................................................... 18

*Katz v. Pershing, LLC*,
  672 F.3d 64 (1st Cir. 2012) ............................................................................................. 11, 12

*Kenney v. State St. Corp.*,
  694 F. Supp. 2d 67 (D. Mass. 2010) ...................................................................................... 18

*Leimkuehler v. Am. United Life Ins. Co.*,
  713 F.3d 905 (7th Cir. 2013) ............................................................................................. 4, 18

*Loomis v. Exelon Corp.*,
  658 F.3d 667 (7th Cir. 2011) .................................................................................................... 4

*Lujan v. Defendants of Wildlife*,
  504 U.S. 555 (1992)................................................................................................................ 11

*Matney v. Barrick Gold of N.A., Inc.*, No.,
  2:20-cv-275, 2022 WL 1186532 (D. Utah Apr. 21, 2022) ..................................................... 17

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016).................................................................................................................. 8

*Thole v. U.S. Bank N.A.*,
  590 U.S. 538 (2020)............................................................................................................. 8, 11

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021).................................................................................................................. 8

*Valentin v. Hosp. Bellas Vista*,
  254 F.3d 358(1st Cir. 2001)................................................................................... 8, 10, 11, 12

*Velazquez v. Mass. Fin. Servs. Co.*,
  320 F. Supp. 3d 252 (D. Mass. 2018) .................................................................................... 11

*White McLaughlin v. Cambridge Sch. Comm.*,
  753 F. Supp. 3d 75 (D. Mass. 2024) ........................................................................................ 9

iii

Statutes

29 U.S.C. § 1105(a) ............................................................................................................... 18

**INTRODUCTION**

The Supreme Court has long emphasized that motions to dismiss are an "important mechanism for weeding out meritless" class action lawsuits brought under the Employee Retirement Income Security Act of 1974 ("ERISA"). *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). It has instructed lower courts to undertake a "context-sensitive" review of an ERISA class action complaint's allegations and, in doing so, "give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022). Most recently, the Supreme Court has encouraged district courts to use "existing tools at their disposal to screen out meritless [ERISA] claims before discovery," including by "dismiss[ing] suits that . . . fail to identify an injury." *Cunningham v. Cornell Univ.*, 604 U.S. 693, 708 (2025).

That is this suit. Plaintiffs allege that Defendant UMass Memorial Health Care, Inc. ("UMass Memorial") breached its fiduciary duties under ERISA by offering higher-cost share classes of three mutual funds—the Fidelity Freedom Target Date Funds ("Freedom Funds"), the Massachusetts Financial Services Company Value Fund ("MFS Value Fund"), and the Baron Small Cap Fund—when identical, lower-cost share classes supposedly were available. *See generally* Dkt. 1 ("Compl."). According to Plaintiffs, that share-class difference caused participants in the UMass Memorial Health Care 401(k) Plan ("401(k) Plan") and the UMass Memorial Health Care 403(b) Plan ("403(b) Plan") (together, the "Plans") to pay excessive fees and suffer millions of dollars in losses.

Plaintiffs are wrong. As the Complaint acknowledges, plans select higher cost share classes to facilitate "revenue sharing," an industry-standard system for paying plan service providers. Under a revenue sharing system, plan service providers collect expenses from plan investment

1

options based on the selected share class. But they also pay "revenue sharing credits" back into the plan, which are "passed through to participants"—i.e., rebated. Compl. ¶ 80. Often, plans will select higher-cost share classes because the associated rebate is so large that, net of the rebate, participants actually pay less than the lowest-cost share class.

Such is the case here. With respect to the Freedom Funds, the Plans' recordkeeper paid all invested participants a rebate that exceeded the fee differential alleged in the Complaint. All invested participants therefore paid less, on a net basis, in the Freedom Fund share classes UMass Memorial selected than they would have paid in the K6 share class.

Plaintiff Henninger's account statements reflect this. He is the only one of the two named Plaintiffs who invested in the Plans' Freedom Funds, and his account statements show that he received the full amount of these quarterly credits in every quarter in which he paid a fee. Plaintiff Henninger therefore lacks Article III standing because he has suffered no injury-in-fact from UMass Memorial's alleged actions. Rule 12(b)(1) requires dismissal of his claims.

Likewise for Plaintiff Borcy, though her standing problem is more fundamental. The Complaint alleges that she participated in the 401(k) Plan, but she did not. She held no investments in the Plans, paid no fees associated with the Plans, and could not have been injured by the conduct alleged in the Complaint.

Plaintiffs' other claims fare no better than their Freedom Funds' theory and likewise must be dismissed for lack of standing. For example, participants in the MFS Value Fund and the Baron Small Cap Fund likewise received credits associated with those funds and thus suffered no injury.

The Complaint also fails to state a plausible claim for relief under Rule 12(b)(6). ERISA's duty of prudence is process-based, yet Plaintiffs plead no facts, plausible or otherwise, about UMass Memorial's process. Instead, they ask the Court to infer an imprudent process based only

2

on the fact that the Plans did not offer the facially lowest-cost share class. That inference cannot survive the obvious alternative explanation the Complaint and the documents it incorporates by reference provide—that the share classes UMass Memorial selected carried revenue credits that left participants better off than they would have been in Plaintiffs' preferred alternatives. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 568 (2007). The disloyalty claim fails for the same reason and one more—it merely relabels the prudence allegations, without a single fact showing UMass Memorial put its own interests ahead of participants.

Before filing this motion, UMass Memorial provided Plaintiffs with the exhibits attached to it and asked that they voluntarily withdraw their claims. Unfortunately, they have declined to do so. Because Plaintiffs suffered no concrete injury and, in any event, fail to plead a plausible fiduciary-breach claim, the Court should dismiss the Complaint in its entirety.

## FACTUAL BACKGROUND

UMass Memorial is a private, non-profit organization and the largest health care system in Central Massachusetts. *See* About Us, https://www.ummhealth.org/about-us (last visited June 8, 2026). To help its employees save for retirement, UMass Memorial sponsors the Plans. The Plans are defined contribution plans, meaning participants direct their individual account balances into investment options available through the Plans' investment menus. Compl. ¶ 19. With limited exceptions, UMass Memorial employees are eligible to participate in the Plans. *Id.* ¶ 21. During the relevant period, Plaintiff Henninger participated in both Plans. *Id.* ¶ 9. Plaintiff Borcy participated in neither Plan. *See* Declaration of Adriana Florez ("Florez Decl."), ¶¶ 4–5.

Among the investment options available through the Plans were the Fidelity Freedom Funds, a series of target date funds that served as the Plans' qualified default investment alternative. Compl. ¶ 27. During the relevant period, the Plans offered two Freedom Fund share

3

classes. Through the end of 2020, the Plans offered the K share class; beginning in the first quarter of 2021 through the fourth quarter of 2024, the Plans offered the retail share class; and beginning in the first quarter of 2025, the Plans offered the K share class. *See generally* Florez Decl., Ex. A.

Participants paid certain expenses associated with investing through the Plans. One such expense is an investment management fee, which mutual fund managers charge for managing the fund's assets. *See Loomis v. Exelon Corp.*, 658 F.3d 667, 669–70 (7th Cir. 2011), *abrog. recog. by Hughes v. Nw. Univ.*, 63 F.4th 615 (7th Cir. 2023). Investment management fees are typically expressed as an "expense ratio"—that is, a percentage of the investor's holdings in the fund. *See* Compl. ¶ 34. For example, an investor who holds $1,000 in a fund with a 0.35% expense ratio would pay $3.50 annually in investment management fees. That same expense ratio can also be expressed as 35 basis points because 100 basis points equal 1%.

The Plans also needed service providers to handle day-to-day recordkeeping and administrative services. As is common, those service providers are compensated through "revenue sharing," an administrative system in which a plan authorizes investment managers for certain mutual funds to collect fees via a fund's expense ratio and remit a portion to the plan's service provider to compensate the service provider for its services. *See Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907–08 (7th Cir. 2013). Revenue sharing amounts often vary by share class: higher-cost share classes may pay more revenue sharing than lower-cost share classes. *See Albert v. Oshkosh Corp.*, 47 F.4th 570, 574 (7th Cir. 2022). Plaintiffs acknowledge in the Complaint that, where the service provider receives more revenue sharing than needed to cover the cost of its services, the excess may be returned to participants through revenue credits. Compl. ¶ 80.

That is what happened here. The operative agreement with Fidelity, the Plans'

4

recordkeeper, required Fidelity to provide revenue credits to participants invested in certain funds. *See* Declaration of Andrew Salek-Raham ("Salek-Raham Decl."), Ex. A at 4. In particular, that agreement required Fidelity to pay a thirty-five basis point revenue credit for participants invested in the Freedom Fund retail share class, and a twenty basis point revenue credit for participants invested in the K share class. *See id.* The agreement did not provide any revenue credit for the K6 share class. *See id.*

The below chart summarizes the Freedom Fund share classes the Plans offered (retail until 2025, K therafter), the difference between the gross fees for those share classes and the K6 share class (which is what Plaintiffs say the Plans should have invested in), and the lower fees the Plans actually paid net of the credits that came with the retail and K share class:[1]



For non-Fidelity-affiliated funds like the MFS Value Fund and the Baron Small Cap Fund challenged here, revenue credits were not fixed; rather, they varied based on the amount

---

[1] The chart is based on the highest-alleged expense ratios for each share class: 50 basis points for the K6 share class; 65 basis points for the K share class; and 67 basis points for the retail share class. *See* Compl. ¶ 57.

participants invested in those funds and the service payments Fidelity received from each fund's asset manager. *See id.* (the revenue credit for non-Fidelity investments equals the "[a]verage daily balances held" in those funds "multiplied by the quarterly rate at which [Fidelity] receives service payments from the asset manager").

Each year, the Plans filed publicly available disclosures, called Form 5500s, with the Internal Revenue Service and the U.S. Department of Labor. The Form 5500s for both Plans disclose that credits "may be applied to pay Plan administrative expenses or allocated to the accounts of the participants." *See, e.g.*, Salek-Raham Decl., Ex. F at 31; Salek-Raham Decl., Ex. K at 37. The Plans' Form 5500s reflect that Fidelity paid these substantial credits to the Plans each year during the relevant period:

| Plan Year | 401(k) Plan Credit[2] | 403(b) Plan Credit[3] |
|---|---|---|
| 2020 | $1,042,813 | $319,038 |
| 2021 | $2,422,228 | $767,081 |
| 2022 | $2,717,168 | $879,766 |
| 2023 | $2,697,808 | $1,046,874 |
| 2024 | $3,180,618 | $1,203,714 |

As participant account statements show, the rebates from Fidelity were deposited directly into participant accounts. For example, Plaintiff Henninger's account statements during the relevant period reflect substantial revenue credits in every quarter in which his account statements reflect that he paid a fee:[4]

---

[2] *See* Salek-Raham Decl., Exs. B at 31; C at 31; D at 30; E at 31; F at 31.

[3] *See* Salek-Raham Decl., Exs. G at 36; H at 36; I at 35; J at 37; K at 37.

[4] While revenue credits were paid for the final two quarters of 2020 and the second quarter of 2021, those credits are not reflected in Plaintiff Henninger's account statements. *See* Florez Decl. Ex. A at 7, 12, 22. But the Plans' Form 5500s reflect that Fidelity paid significant revenue credits to the Plans in every year of the relevant period, and the 401(k) Plan's recordkeeping invoice reflects the same for the second quarter of 2021. *See supra* at 6; Salek-Raham Decl., Ex. L at 5 (reflecting that $698,771.01 was "[t]ransfer[red] to participant accounts" in the 401(k) Plan).

| Plaintiff Henninger 401(k) Plan Freedom Fund Revenue Credits[5] | | | |
|---|---|---|---|
| Quarter | Revenue Credit | Freedom Fund Investment Fee | Net |
| Q1 2021 | $71.67 | $71.67 | $0.00 |
| Q3 2021 | $148.63 | $148.64 | $0.00 |
| Q4 2021 | $80.70 | $80.70 | $0.00 |
| Q1 2022 | $83.47 | $83.47 | $0.00 |
| Q2 2022 | $81.28 | $81.28 | $0.00 |
| Q3 2022 | $75.38 | $75.38 | $0.00 |
| Q42022 | $73.16 | $73.16 | $0.00 |
| Q1 2023 | $73.67 | $73.67 | $0.00 |
| Q2 2023 | $82.23 | $82.23 | $0.00 |
| Q3 2023 | $88.25 | $88.25 | $0.00 |
| Q4 2023 | $94.00 | $94.00 | $0.00 |
| Q1 2024 | $96.68 | $96.68 | $0.00 |
| Q2 2024 | $109.94 | $109.94 | $0.00 |
| Q3 2024 | $116.93 | $116.93 | $0.00 |
| Q4 2024 | $122.12 | $122.12 | $0.00 |
| Q1 2025 | $40.14 | $40.14 | $0.00 |
| Q2 2025 | $6.90 | $6.90 | $0.00 |
| Q3 2025 | $4.78 | $4.78 | $0.00 |
| Q4 2025 | $5.28 | $5.28 | $0.00 |
| Q1 2026 | $3.07 | $3.07 | $0.00 |
| Plaintiff Henninger 403(b) Plan Freedom Fund Revenue Credits[6] | | | |
| Quarter | Revenue Credit | Freedom Fund Investment Fee | Net |
| Q4 2024 | $116.65 | $116.65 | $0.00 |
| Q1 2025 | $61.62 | $61.62 | $0.00 |
| Q2 2025 | $87.83 | $87.83 | $0.00 |
| Q3 2025 | $89.16 | $89.16 | $0.00 |
| Q4 2025 | $92.75 | $92.75 | $0.00 |
| Q1 2026 | $95.14 | $95.14 | $0.00 |

---

[5] The revenue credits and fees are reflected in Plaintiff Henninger's 401(k) Plan account statements. *See* Florez Decl., Ex. A. The "revenue credit" column is found in the "Fid Freedom" column in the "Your Account Activity" section of each account statement, while the "Freedom Fund Investment Fee" column is the sum of the "fees" entries in the "Fid Freedom" portion of the "Your Transaction Detail" section of each account statement. *See, e.g.*, *id.* at 102–03 (reflecting a $40.14 revenue credit under "Fid Freedom 2040 K" column in the "Your Account Activity" section, and $38.87 and $1.27 in fees in the "Your Transaction Detail" section, for a net of $0.00).

[6] Like the 401(k) Plan account statement, the revenue credits and fees are reflected in the "Your Account Activity" and "Your Transaction Details" sections, respectively, of Plaintiff Henninger's 403(b) Plan account statements. *See, e.g.*, Florez Decl., Ex. A at 225–27; *see also supra* n.5.

7

Plaintiff Borcy did not participate in either Plan at any point during the relevant period, and she thus did not pay any fees for, or receive any revenue credits associated with, the investments in the Plans. *See* Florez Decl., ¶¶ 4–5.

## LEGAL STANDARDS

A motion to dismiss under Rule 12(b)(1) "for lack of standing challenges whether the plaintiff is a proper party to invoke federal jurisdiction." *Gideon Asen LLC v. Glessner*, 583 F. Supp. 3d 242, 246 (D. Me. 2022) (internal quotation omitted). "To establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Assessing standing at the pleading stage plays an important role in addressing the "serious concern" of an "avalanche" of meritless ERISA class action lawsuits, and courts "must . . . dismiss suits that allege" a statutory violation "but fail to identify an injury." *Cunningham*, 604 U.S. at 708. "There is no ERISA exception to Article III." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020)

In assessing a factual standing challenge—as UMass Memorial advances here—the plaintiff's "jurisdictional averments are entitled to no presumptive weight." *Valentin v. Hosp. Bellas Vista*, 254 F.3d 358, 363(1st Cir. 2001). Rather, such a challenge "permits (indeed, demands) differential factfinding," and the "court enjoys broad authority to order discovery, consider extrinsic evidence, and hold evidentiary hearings in order to determine its own jurisdiction." *Id.*

A motion to dismiss under Rule 12(b)(6), on the other hand, "tests the legal sufficiency of

the allegations contained in the complaint." *White McLaughlin v. Cambridge Sch. Comm.*, 753 F. Supp. 3d 75, 79 (D. Mass. 2024). To survive a Rule 12(b)(6) motion, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570 (2007)). Facial plausibility requires factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged; allegations that are "merely consistent with" liability, or that do not nudge a claim "across the line from conceivable to plausible," do not satisfy this standard. *Id.* at 678, 680 (internal quotation omitted); *Twombly*, 550 U.S. at 570.

These principles carry particular force in ERISA breach of fiduciary duty cases. The Supreme Court has instructed that such claims warrant "careful, context-sensitive scrutiny" that performs "the important task of weeding out meritless claims," separating "the plausible sheep from the meritless goats." *Dudenhoeffer*, 573 U.S. at 425. And in evaluating an alleged breach of the duty of prudence, the Court must "give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 595 U.S. at 177.

## **ARGUMENT**

The Complaint should be dismissed in its entirety. *First*, Plaintiffs lack Article III standing. Plaintiff Borcy did not participate in either of the Plans, and Plaintiff Henninger received revenue credits that eliminated any alleged injury. The Plans' recordkeeping agreement and Form 5500s also make clear that participants received large revenue credits for non-Fidelity funds—like the MFS Value Fund and the Baron Small Cap Fund. Absent any allegation that those credits were insufficient, Plaintiffs fail to meet their burden of establishing any harm. The Court should therefore dismiss the entirety of the Complaint under Rule 12(b)(1).

*Second*, the Court should dismiss Plaintiffs' claims under Rule 12(b)(6) for failing to state

a claim. Plaintiffs acknowledge that participants received credits but never allege that those credits failed to cover the differences in costs between the allegedly imprudent share classes and their proposed alternatives. Those credits are the obvious alternative explanation for UMass Memorial's selection of the higher-cost share classes—the facially higher cost share classes were actually a net benefit to participants.

## I.    Plaintiffs Lack Article III Standing.

UMass Memorial raises a factual challenge to the Court's subject matter jurisdiction, and the facts are indisputable. They appear in the named Plaintiffs' own account statements and in the Plans' recordkeeping agreement—records on which the Complaint's theory depends. On a factual challenge to standing, the Court must engage in "differential factfinding," and Plaintiffs' standing allegations "are entitled to no presumptive weight." *Valentin*, 254 F.3d at 363; *see also Eggert v. The Merrimac Paper Co., Inc. Leveraged Employee Stock Ownership Plan and Trust*, 311 F. Supp. 2d 245, 248 (D. Mass. 2004) ("[W]hen the moving party factually attacks the complaint, the allegations have no presumptive truthfulness."). In assessing such a challenge, the Court is "allowed considerable leeway in weighing the proof, drawing reasonable inferences, and satisfying itself that subject-matter jurisdiction has attached." *Valentin*, 254 F.3d at 364; *Eggert*, 311 F. Supp. 2d at 248 (explaining that in resolving a 12(b)(1) factual challenge, "the Court must weigh the evidence and may consider extrinsic evidence from affidavits and other documents"). The documents attached to this Motion make clear that neither Plaintiff has suffered the concrete, individualized injury that Article III requires.[7]

---

[7] The documents UMass Memorial relies upon—the recordkeeping agreement, Form 5500s, and account statements—are also appropriately considered under a Rule 12(b)(1) facial challenge and/or Rule 12(b)(6) because they are incorporated by reference in, and central to, the Complaint. *See Dubuisson v. United* States, No. 21-12116-JGD, 2021 WL 753346, at *1 (D. Mass. Feb. 22, 2021) ("[D]ocuments that are central to plaintiff['s] claim, and documents that are sufficiently referred to in the complaint[,] may be considered

**A.**         *Plaintiff Borcy Lacks Standing Because She Did Not Participate in Either Plan.*

Plaintiff Borcy lacks standing for a straightforward reason—she did not participate in the 401(k) Plan or the 403(b) Plan. To satisfy the injury-in-fact requirement, Plaintiff Borcy "must have personally suffered some harm." *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012); *see also Lujan v. Defendants of Wildlife*, 504 U.S. 555, 560 n.1 (1992) ("By particularized, we mean that the injury must affect the plaintiff in a personal and individual way."). Although the Complaint alleges that Plaintiff Borcy participated in the 401(k) Plan, *see* Compl. ¶ 10, that allegation is entitled to no presumptive weight against a factual attack on standing, *Valentin*, 254 F.3d at 364. And it is wrong. *See* Florez Decl., ¶¶ 4–5. Plaintiff Borcy therefore could not have suffered any injury from the conduct alleged in the Complaint—she held no investments in either Plan, paid no expenses related to investments in either Plan, and thus suffered no harm from the decisions she challenges.

For the same reason, Plaintiff Borcy cannot satisfy Article III's redressability requirement. Redressability requires a showing that "the court can fashion a remedy that will at least lessen [the] injury." *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 49 (1st Cir. 2020). If Plaintiffs were to prevail, any relief awarded would run to the Plans or their participants— not to Plaintiff Borcy, who participated in neither Plan. *See* Florez Decl., ¶¶ 4–5. She therefore has "no concrete stake in this dispute." *Thole*, 590 U.S. at 547 (finding no standing where "[w]inning or losing this suit would not change the plaintiffs' monthly pension benefits").

---

equally under Rule 12(b)(1) and 12(b)(6)."); *Beddall v. State Street Bank and Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998) (affirming district court's review of a trust agreement under Rule 12(b)(6) because the complaint was "expressly linked" to it); *Velazquez v. Mass. Fin. Servs. Co.*, 320 F. Supp. 3d 252, 255 n.1 (D. Mass. 2018) (Form 5500s are public records that are "routinely considered on motions to dismiss in the ERISA context").

B.    *Plaintiff Henninger Lacks Standing Because The Challenged Freedom Funds Share Classes Made Him Better Off.*

Although Plaintiff Henninger participated in both Plans, he also lacks Article III standing because he suffered no injury from the share-class decisions he challenges. *See Katz*, 672 F.3d at 71. His theory of harm is narrow and economic: he alleges that UMass Memorial caused him to pay excessive fees by offering the retail and K share classes of the Fidelity Freedom Funds rather than the K6 share class. *See* Compl. ¶¶ 54, 56–57. That theory depends solely on comparing the gross expense ratios of the challenged share classes to the K6 share class. *Id.*

But the documents governing and reflecting Plaintiff Henninger's actual Plan investments—the Plans' recordkeeping agreement and his Plan account statements, which the Court may consider in resolving a Rule 12(b)(1) factual challenge to standing, *see Valentin*, 254 F.3d at 364—show that Plaintiff Henninger suffered no economic injury. That is because Plaintiff Henninger received a revenue credit generated by his Freedom Funds investments in both Plans.[8] *See supra* at 6–7. For example, in his 401(k) Plan account, the "Your Account Activity" section of the statement for the first quarter of 2023 reflects the starting balance, contributions, fees, revenue credit, change in account value, and ending balance of Plaintiff Henninger's account. *See* Florez Decl., Ex. A at 59. That section shows a $73.67 revenue credit, all of which is attributable to his investment in the "Fid Freedom 2040" retail share class. *Id.* The "Your Transaction Detail" section of that statement reflects "fees" for the "Fid Freedom 2040" of $73.67. *Id.*

The 403(b) Plan account statement is the same. The statement for the first quarter of 2025 likewise includes a "Your Account Activity" section, which reflects the same information for each investment Plaintiff Henninger held, along with a "Total" section at the end. *See id.* at 220. The

---

[8] While Plaintiff Henninger's 401(k) Plan account statements do not reflect revenue credits in the third and fourth quarters of 2020 or the second quarter of 2021, the Plans' Form 5500s and recordkeeping invoice make clear that Fidleity provided cedits to the Plans during those quarters. *See supra* n.4.

credit appears in the column for his "Fid Freedom Retire K" investment—a $61.62 revenue credit—confirming, as with his 401(k) Plan account, that the credit flowed from his Freedom Fund holding. *Id.* The "Your Transaction Detail" sections show "fees" of $45.55, $14.36, and $1.71 in the "Fid Freedom Retirement K" sections, for a total of $61.62. *Id.* at 221–22.

Those facts defeat Plaintiff Henninger's alleged injury. Plaintiff Henninger alleges that the difference between the K and K6 share classes ranged from four to fifteen basis points. Compl. ¶ 57. He does not allege the precise difference between the retail and K6 share classes, but he alleges that the K share class "generally trail[s] the . . . retail share class[] by only a couple of basis points." *Id.* ¶ 45. Thus, even accepting the Complaint's allegations, the alleged difference between the retail and K6 share classes is no more than approximately ***seventeen basis points***. To establish an economic injury, those alleged fee differentials must exceed the revenue credits Plaintiff Henninger received.

They do not. From the first quarter of 2021 through the fourth quarter of 2024, Plaintiff Henninger received a ***thirty-five basis point revenue credit*** for the Freedom Fund retail share class. *See supra* at 5. That credit exceeded the alleged difference between the retail and K6 share classes by eighteen basis points. Beginning in the first quarter of 2025, Plaintiff Henninger received a twenty basis point revenue credit for the Freedom Fund K share class. *See id.* That credit likewise exceeded the ***maximum*** alleged fifteen basis point difference between the Freedom Fund K and K6 share classes. Put simply, Plaintiff Henninger ***paid less on a net basis*** for his investments in the retail and K share classes than he would have paid had UMass Memorial selected the K6 share class.

That is fatal to Plaintiff Henninger's standing. Participants who benefit from a fiduciary's alleged breach "suffer no injury and have no constitutional standing." *In re Boston Scientific Corp.*

13

*ERISA Litig.*, 254 F.R.D. 24, 31 (D. Mass. 2008); *see also Fishman Haygood Phelps Walmsley Willis & Swanson, L.L.P. v. State St. Corp.*, No. 1:09-10533-PBS, 2010 WL 1223777, at \*7 (D. Mass. Mar. 25, 2010) (finding no standing where "the [alternative] investments would have been outperformed by the actual investments made by the defendants").

Because Plaintiff Henninger paid less in fees than he would have paid had UMass Memorial selected the K6 share class, he suffered no injury-in-fact. The Court should therefore dismiss his claims based on the Freedom Funds for lack of Article III standing.

C.       *Plaintiff Henninger Lacks Standing to Pursue Claims Related to The MFS Value Fund And The Baron Small Cap Fund.*

Plaintiff Henninger has failed to meet his burden of alleging that he has standing to challenge the other two investments identified in the Complaint: the MFS Value Fund and the Baron Small Cap Fund. *See* Compl. ¶¶ 67–75. The Complaint again alleges that participants suffered harm by UMass Memorial's failure to select the lowest-cost share class of these investments. *See id.* ¶ 68–69. But Plaintiffs' allegations are silent as to revenue credits related to the non-Fidelity investment products available in the Plans.

The Plans' recordkeeping agreement with Fidelity shows that, as with the Freedom Funds, participants received credits for the MFS Value Fund and Baron Small Cap Fund. For these non-Fidelity funds, Fidelity funded a revenue credit that was calculated based on the amount participants invested in those funds and the service payments Fidelity received from each fund's asset manager. *See* Salek-Raham Decl., Ex. A at 4 (the revenue credit for non-Fidelity investments equals the "[a]verage daily balances held" in those funds "multiplied by the quarterly rate at which [Fidelity] receives service payments from the asset manager[.]").

The Form 5500s show that Fidelity paid considerable rebates to the Plans in every year of the relevant period. *See supra* at 6. Those rebates were passed on as revenue credits to participants

14

who selected non-Fidelity investment products that paid service payments to Fidelity, like Plaintiff Henninger, who selected the "TRP Growth Blue Chip" fund in his 403(b) Plan account and received approximately \$620 in revenue credits during the 2022 plan year.[9] *See* Florez Decl., Ex. A at 167 (\$186.48 revenue credit), 171 (\$159.46 revenue credit), 175 (\$137.87 revenue credit), 179 (\$136.08 revenue credit).

Put simply, Plaintiff Henninger has not met his burden of establishing that any participant suffered harm as a result of the share class decisions. He therefore lacks standing to challenge these investment decisions, and his claims should be dismissed.

## II.     The Complaint Fails to State a Plausible Claim for Relief.

Standing aside, the Court should also dismiss the Complaint under Rule 12(b)(6). Plaintiffs allege that UMass Memorial breached its fiduciary duties of prudence and loyalty under ERISA Section 404(a) by failing to select the lowest-cost share classes. But as discussed below, Plaintiffs' allegations have not "nudged their claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, because there is an "obvious alternative explanation" for UMass Memorial's selection of the higher-cost share classes: to facilitate revenue sharing and obtain offsetting service provider credits.

### A.     *Plaintiffs' Allegations Fail to Raise an Inference of Imprudence.*

When considering a motion to dismiss, district courts "must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 595 U.S. at 177. Plaintiffs therefore must plausibly allege that UMass Memorial's share class

---

[9] Because Plaintiff Henninger did not invest in either the MFS Value Fund or the Baron Small Cap Fund at any point during the relevant period, he has no basis to even assert what the amount of the revenue credits for those funds were, let alone that they did not exceed the fee differentials he alleges in the Complaint.

15

decisions fell outside "the range of reasonable judgments a fiduciary" could have made under the circumstances. *Id.*

The Complaint fails to make that showing. To the contrary, its own allegations—and the documents incorporated by reference and central to its claims—supply an "obvious alternative explanation" for UMass Memorial's selection of the higher-cost share classes: revenue sharing and its associated credits.[10] *See Frith v. Whole Foods Market, Inc.*, 38 F.4th 263, 275 (1st Cir. 2022). Indeed, the Complaint alleges that "across both Plans," UMass Memorial "agreed to revenue-sharing arrangements" "tied to higher-cost share classes." Compl. ¶¶ 77, 79. Though the Complaint acknowledges that "revenue sharing credits" could have "passed through to participants," *id.* ¶ 80, it contains no well-pled allegations that the difference in expense ratios alleged in the Complaint were larger than the revenue credits participants received. And for good reason: documents central to Plaintiffs' allegations—including publicly available Forms 5500 and Plaintiff Henninger's very own account statements—make clear that the Plans received substantial rebates from the revenue sharing arrangement in every year of the relevant period, which were passed on to participants.

As explained above, the recordkeeping agreement required Fidelity to fund revenue credits of thirty-five basis points for the Freedom Fund retail share class, twenty basis points for the K share class, and no credit for the K6 share class. *See supra* at 5. Those credits (thirty-five and twenty basis points) exceed the corresponding fee differentials Plaintiffs allege between the K6 share class and the retail and K share classes (approximately seventeen and at most fifteen basis points, respectively). *See* Compl. ¶ 57. The recordkeeping agreement also required Fidelity to pay a revenue credit for non-Fidelity funds, like the MFS Value Fund and the Baron Small Cap Fund,

---

[10] The documents attached to this Motion are properly considered under Rule 12(b)(6). *See supra* n.7.

based on the amount participants invested in those funds and the service payments Fidelity received from each fund's asset manager. *See supra* at 5–6. The Form 5500s, in turn, confirm that Fidelity complied with the recordkeeping agreement and deposited substantial credits into the Plans in every year of the relevant period. *See supra* at 6.

Taken together, the Complaint's allegations and the documents central to them supply an "obvious alternative explanation" for UMass Memorial's selection of the higher-cost share classes that forecloses any plausible inference of imprudence—the revenue-sharing payments associated with those share classes left participants better off financially. *See Frith*, 38 F.4th at 275. The Complaint contains no non-conclusory allegation that the credits participants received were smaller than the cost differentials it alleges for any challenged investment. *See generally* Compl. And other courts have dismissed materially similar claims. *See, e.g.*, *Matney v. Barrick Gold of N.A., Inc.*, No. 2:20-cv-275, 2022 WL 1186532, at *7 (D. Utah Apr. 21, 2022) (dismissing share class claim where, "[t]aking into account the 15-basis-point revenue credit that Defendants negotiated for the [challenged share class], the Plan's expense ratio . . . was actually less than the" purportedly lower-cost share class alleged in the complaint).

Because Plaintiffs have not plausibly alleged that UMass Memorial's share class selections fell outside "the range of reasonable judgments a fiduciary" could have made under the circumstances, the Court should dismiss Count I. *Hughes*, 595 U.S. at 177.

B.    *Plaintiffs Fail to Allege Disloyal Conduct.*

To state a disloyalty claim under ERISA Section 404, a plaintiff must allege plausible facts that a fiduciary "engaged in self-dealing at the expense of the Plan." *Albert*, 47 F.4th at 583; *see also In re Biogen, Inc. ERISA Litig.*, No. 20-cv-11325-DJC, 2021 WL 3116331, at *9 (D. Mass. July 22, 2021) ("[T]he duty of loyalty prohibits a fiduciary from engaging in transactions that

17

involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests.") (internal quotation omitted). A plaintiff cannot meet that standard by recasting allegations of imprudent conduct as disloyalty. *See, e.g.*, *Kenney v. State St. Corp.*, 694 F. Supp. 2d 67, 79 (D. Mass. 2010) (dismissing disloyalty claim where its allegations derived substantially from the plaintiff's imprudence claim).

Plaintiffs do just that. They premise their disloyalty theory almost entirely on the same conduct underlying their prudence claim—UMass Memorial's alleged failure to select the lowest-cost share classes. *See* Compl. ¶¶ 76–83. The only allegation arguably unique to the loyalty count—that UMass Memorial used revenue sharing to benefit itself or other third parties, *id.*—fares no better. Revenue sharing "has been commonplace for years," *Leimkuehler*, 713 F.3d at 908, and "does not amount to a per se violation of fiduciary duty under ERISA." *Hughes v. Nw. Univ.*, 63 F.4th 615, 625 (7th Cir. 2023). And the premise is factually wrong: as discussed above, the revenue-sharing credits flowed to participants, not to UMass Memorial. *See supra* at 5–6. Without any allegations of disloyal conduct, the Court should dismiss Count II.

### C.       The Court Should Dismiss Plaintiffs' Co-Fiduciary Claim.

In Count III, Plaintiffs assert that UMass Memorial is liable as a co-fiduciary under 29 U.S.C. § 1105(a). *See* Compl. ¶¶ 130–36. That claim is derivative of Plaintiffs' underlying fiduciary breach claims. *See Jackson v. New England Biolabs, Inc.*, 729 F. Supp. 3d 60, 70 (D. Mass. 2024). Because Plaintiffs fail to allege any plausible underlying breach of fiduciary duty, their co-fiduciary liability claim also fails.

Moreover, Plaintiffs fail to satisfy their pleading requirements for the co-fiduciary liability claim, making only conclusory allegations without any supporting facts. The Complaint asserts no more than the statutory elements of a co-fiduciary liability claim. *See* Compl. ¶¶ 130–36. Such

18

bare allegations cannot state a valid claim. *See Twombly*, 550 U.S. at 555 (to avoid dismissal, a plaintiff must provide more than mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action").

**CONCLUSION**

For all of these reasons, UMass Memorial requests that the Court grant this Motion and dismiss the Complaint in its entirety.

Date:  June 22, 2026

By: /s/ *Andrew Salek-Raham*
Lars C. Golumbic (*pro hac vice*)
Andrew D. Salek-Raham (*pro hac vice*)
Richard A. Smith, Jr. (*pro hac vice*)
**GROOM LAW GROUP, CHARTERED**
1701 Pennsylvania Avenue, NW
Washington, DC 20006
T:  (202) 857-0620
F:  (202) 659-4503
lgolumbic@groom.com
asalek-raham@groom.com
rsmithjr@groom.com

Amanda M. Baer, Esq. BBO #681386
**Mirick, O'Connell, DeMallie & Lougee, LLP**
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
Phone: (508) 768-0730
abaer@miricklaw.com

*Attorneys for Defendant UMass Memorial Health Care, Inc.*

19

## CERTIFICATE OF CONFERENCE

In accordance with Local Rule 7.1(a), I hereby certify that counsel for Defendant conferred and attempted in good faith to resolve or narrow the issues set forth in this motion with Plaintiffs' counsel on June 12, 2026. Plaintiffs' counsel indicated that that Plaintiffs oppose the requested relief.

By: */s/ Andrew D. Salek-Raham*
Andrew D. Salek-Raham (*pro hac vice*)

1

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 22, 2026, a true copy of the foregoing document was filed through the CM/ECF system, and that a true copy of the document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

By: */s/ Andrew D. Salek-Raham*
Andrew D. Salek-Raham (*pro hac vice*)

1